IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| ANDREA JACKSON, INDIVIDUALLY, § | | |
| AND AS NEXT FRIEND OF MINOR § | | |
| CHILDREN NA.J., K.J. AND NI.J.,[1] § | | |
| *Plaintiffs*, § | | |
| § | | |
| v. § | Civil Action No. 1:20-CV-832 | |
| § | | |
| DOORDASH INC., BRENDAN BALTER, § | | |
| VR STONECREEK HOLDINGS, L.P., AND § | | |
| VENTERRA REALTY MANAGEMENT § | | |
| COMPANY, INC., § | | |
| *Defendants*. § | | |

**PLAINTIFFS' FIRST AMENDED COMPLAINT**

---

[1] In light of Federal Rule of Civil Procedure 5.2(a), the caption of this action has been adjusted to reflect only the minors' initials, even though their full names appeared in the state-court record.

Plaintiffs Andrea Jackson, Individually, and as Next Friend of Minor Children, Na. J., K. J., and Ni. J., file this Plaintiffs' First Amended Complaint and respectfully show this Court as follows:

## I. Summary of the Facts

1. On May 25, 2019, Defendant Balter, when driving for DoorDash, crashed into Na. J. (the collision) at Stonecreek Ranch Apartments (Stonecreek Ranch) causing her significant injuries. Upon information and belief, Defendant Balter was using his phone to coordinate with DoorDash when he crashed into Na. J. The collision caused Na. J. to suffer a traumatic brain injury and she now has seizures.

2. Na. J's siblings K. J. and Ni. J., who both witnessed this tragic event. They will forever have to deal with gruesome image of their sister bleeding from her head after being hit by Defendant Balter. Furthermore, they are constantly and cruelly reminded whenever their sister suffers a seizure and by the helmet that she is forced to wear every day for her safety.

3. The collision occurred at Stonecreek Ranch, an apartment complex owned by VR Stonecreek Holdings, L.P. and managed by Venterra Realty Management Co., Inc. (individually "Defendant Venterra" and jointly "VR Defendants").

4. Upon information and belief, the VR Defendants knew people were driving recklessly through their parking lot. The foreseeable consequence was a collision like the one that is the subject matter of this lawsuit. Defendant Venterra using traffic-control signs, speed bumps, and other methods to help control reckless driving at other properties it manages. However, the VR Defendants failed to take these same safety measures at Stonecreek Ranch (as further explained below)—instead only posting speed limit signs. The VR Defendants actions and inactions contributed to Defendant Balter crashing into Na. J.—thereby changing Na. J.'s, K. J.'s, and Ni. J's lives forever.

1

## II. Parties

5.  Plaintiffs Andrea Jackson, Na. J, K. J., and Ni. J, are natural persons residing in Travis County, Texas.

6.  Defendant DoorDash Incorporated is a foreign entity authorized to do business in Texas and is represented by Trek Doyle of Doyle & Seelbach, PLLC located at 7700 W. Highway 71, Suite 250 Austin, Texas 78735.

7.  Defendant Brenden Balter is a natural person residing in Travis County Texas at the time of the collision. Defendant Balter is represented by Andrew J Schumacher and Peter Nolan of Winstead PC located at 401 Congress Avenue, Suite 2100, Austin, Texas 78701.

8.  Defendant VR Stonecreek Holdings, L.P. is a foreign entity with a principal place of business at 711 West Bay Area Boulevard Suite 602 Webster, Texas 77598. Upon information and belief, plaintiffs allege that one of its members is a citizen of Texas. The citizenship of its members has not been affirmatively alleged. VR Stonecreek Holdings, L.P. is represented by S. Jan Hueber of Litchfield Cavo, LLP located at 100 Throckmorton St., Ste. 500, Fort Worth, Texas 76102.

9.  Defendant Venterra Realty Management Company, Inc. is a foreign entity doing business in Texas that is represented by s represented by S. Jan Hueber of Litchfield Cavo, LLP located at 100 Throckmorton St., Ste. 500, Fort Worth, Texas 76102.

10. All Defendants have been served and have appeared in this action.

## III. Jurisdiction and Venue

11. This action was initially filed in state court in Travis County, and was removed to this Court based on the assertion of diversity jurisdiction pursuant to 28 U.S.C. § 1332. However, Plaintiffs moved to remand this action for lack of subject-matter jurisdiction. Although the amount in controversy requirement is satisfied (as Plaintiffs seek monetary relief over $1,000,000), the

Defendants failed to meet their burden of establishing that the parties were completely diverse at the time of filing and the time of removal.

12. At all times relevant to this matter, Defendants conducted substantial business in this district. Defendants did business within the State of Texas and have had substantial, continuous, and systematic contacts with the State of Texas, have consented to jurisdiction in the State of Texas, and/or committed a tort in whole or in part in the State of Texas, as more fully set forth below. In any event, all Defendants have now waived any challenges to personal jurisdiction.

13. Venue was initially proper in Travis County, Texas pursuant to §15.002 of the TEX. CIV. PRAC. & REM. CODE because a substantial part of the events and omissions giving rise to Plaintiffs' causes of action arose in Travis County, Texas. Venue is proper in this Court under 28 U.S.C. §1446, as this action was pending in Travis County, Texas at the time of its removal. Furthermore, all defendants have now waived any challenge to the propriety of venue in this Court.

**IV. <u>Factual Allegations</u>**

14. Andrea Jackson is the mother of Na. J. (age 3), K. J. (age 12), and Ni. J. (age 13).[2] Andrea Jackson resides in Austin with her three children. Andrea Jackson works hard as a home healthcare assistant to provide for her family.

15. On May 25, 2019, Ms. Jackson, returned home from work and allowed Na. J to play outside under the supervision of her older siblings Ni. And K. J. At approximately 4:30 p.m. while the siblings were playing outside—as is typical for young children at Stonecreek Ranch and other apartment complexes.

16. At the same time, Brendan Balter was busy driving for DoorDash, rushing a delivery from Wal-Mart to a DoorDash customer at Stonecreek Ranch.

17. Mr. Balter ran into Na. J. in the parking lot.

---

[2] All ages are calculated on May 25, 2019.

3

18. Na. J suffered a traumatic brain injury as a result of the wreck, which has greatly altered her life. For example, Na. J. now suffers from seizures.

19. K. J. and Ni. J. both witnessed their younger sister get hit.

20. Upon information and belief, Defendant Balter did not see Na. J because he was using his phone while driving. Simply put, Defendant Balter was a distracted driver.

21. Upon information and belief, DoorDash not only allows its Dashers to use the Dasher App. while driving—but DoorDash incentivizes this dangerous behavior.

**A. DoorDash's business uses and relies on Dashers like Mr. Balter to deliver food.**

22. Upon information and belief, DoorDash provides its customers with an on-demand delivery service through its mobile phone application (the "DoorDash App"). Customers can use the DoorDash App to order food from restaurants and stores.

23. To ensure deliveries to its customers, DoorDash maintains a workforce of over 300,000 delivery drivers.

24. Applicants for a delivery driver position at DoorDash must pass a background and vehicle check. If approved, drivers must download DoorDash's companion application for its delivery drivers, the "Dasher App." DoorDash uses the term "Dasher" to refer to its drivers.

25. Through the Dasher App, DoorDash assigns orders to its Dashers.

26. When Dashers are ready to begin their shift, they must click a button in the Dasher App indicating that they are ready to deliver orders.

27. When filling a typical order, Dashers must drive to the assigned merchant; find a parking spot; notify DoorDash that they have arrived; pick up the order if it's ready or wait to pick it up until the merchant finishes preparing it; pay for the food using a special credit card provided by DoorDash (the "Red Card"); notify DoorDash that they have picked up the food; drive to the

customer's location; find a parking spot; follow any specific delivery instructions provided by DoorDash; deliver the food to the customer; and notify DoorDash that the food has been delivered.

28. Upon information and belief, Dashers who fail to follow DoorDash's precise instructions can be terminated.

**B. DoorDash uses metrics to control how drivers perform the work.**

29. DoorDash measures drivers on four "metrics": (1) "On Time" Deliveries – that is, the percentage of orders that were delivered on or before the delivery time provided to the customer; (2) Average Customer Rating – a rating of the Dasher's performance from 1 to 5 stars, which customers fill out after receiving their orders, (3) Completion Rate – percentage of orders that were successfully delivered; and (4) Acceptance Rate – percentage of order opportunities that the Dasher accepts.

30. Dashers often worry about their metrics, because low metrics can harm their opportunities to earn money and can be grounds for termination.

31. Dashers with low metrics are terminated. For example, DoorDash bans drivers from the Dasher App if the driver's Average Customer Rating falls below 4.2 stars

32. These star ratings are used primarily for punishment. Customers cannot use the ratings to select which driver they want.

33. The metrics also affect eh quality of assignments that Dashers are eligible to receive. For example, Dashers with low metrics are generally not eligible to receive "Drive" orders, which typically consist of large catering orders or grocery deliveries.

34. DoorDash imposes strict delivery requirements on drivers.

35. DoorDash drivers must deliver the food on a tight delivery schedule or face consequences.

36. For each delivery, DoorDash provides the customer and Dasher with the exact time that the Dasher is expected to arrive at the vender and the exact time the Dasher should arrive at the

5

customer's location. DoorDash provides the customer with a map showing the Dasher's precise location at every moment.

37. When a Dasher falls even slightly behind schedule, they not only hurt their "On Time" delivery statistics, but they also risk receiving a bad customer rating. Customers will often leave a 1-star rating if an order is late, even if the tardiness is not the driver's fault. Customers generally cannot distinguish between delays caused by the Dasher, DoorDash, or the vendor.

38. Dashers can hurt their "metrics" by also trying to accept only plum assignments.

39. When DoorDash assigns an order to a Dasher, the Dasher has a brief period during which they can decline the order. DoorDash provides Dashers with an estimate of the amount of money they can receive and the driving distance.

40. Dashers who try to accept only high-paying or low-distance orders face termination. According to DoorDash's "Deactivation Policy," drivers with an extremely low acceptance rate may be terminated (without defining "extremely low")

41. DoorDash also makes rivers ineligible for incentive pay if their Acceptance Rate is too low. For example, Dashers cannot receive "peak pay" (a bonus for delivering orders during periods of high demand) if they maintain too low of an acceptance rate.

**C. DoorDash keeps tips left for its Dashers.**

42. Under the compensation system in place at the time of Mr. Balter hit Na. J., DoorDash typically used tips that customers left for drivers to pay its own costs, rather than to increase Dasher's total compensation.

43. When DoorDash offered an order to a Dasher, the Dasher App would display a guaranteed minimum amount the Dasher would earn if they accepted the order. DoorDash guaranteed to pay this amount from its own coffers.

6

44. Unbeknownst to many Dashers, if they later received a tip, the tip would typically not increase their take-home pay beyond this guaranteed amount. Buried in the "Help" section of its website, DoorDash explained that drivers were entitled to *either* the guaranteed amount *or* 100% of their tips (plus $1 in base pay from DoorDash), but not both. The Dasher would receive whichever amount was larger.

45. Take, for example, an order for which DoorDash guaranteed at least $5. Whether the customer left no tip, a $1 tip, $2 tip, or $3 tip, DoorDash would pay the Dasher $5. In contrast, if the customer left, for example a $7 tip, DoorDash would give the Dasher the full tip ($7) and one additional dollar ($1) of base pay from DoorDash. The Dasher would either be paid based on tips or based on the guaranteed minimum, but not both.

46. In July 2019, face with a media storm of angry drivers and upset customers, who wanted their tips to serve as a bonus for workers rather than subsidizing DoorDash's operations," DoorDash agreed to change its compensation model (starting in August 2019), so that Dashers always received their tips.[3]

**D. DoorDash Dashers are "employees"**

47. Companies like DoorDash were never supposed to be allowed to run an entire business on the backs of independent contractors. People who work in the company's core line of business are its "employees." *United States v. Silk*, 331 U. S. 704, 718 (1947).

48. DoorDash claims an unprecedented portion of its workforce as "independent contractors,"[4] and only classifies about 2.5% of its workforce as "employees." These workers, many of whom are computer programmers, receive special treatment form DoorDash.

---

[3] Danielle Abril, *DoorDash's New Tipping Policy Has Increased Driver Pay*, Fortune (Nov. 12, 2019), https://fortune.com/2019/11/12/doordash-new-tipping-policy-worker-pay/

[4] Keith Cunningham-Parameter, *From Amazon to Uber: Defining Employment in the Modern Economy*, 96 B.U. L. Rev. 1673, 1683-84 (2016)

49. By design, "independent contractors" are exempted from nearly every labor law, but this classification was not meant to be a loophole for companies like DoorDash. As an article in the *Boston University Law Review* explains, "Historically, firms reserved independent contractor designation for entrepreneurial individuals whose skills demanded higher pay in the open market." With this in mind, "[l]egislatures rationalized excluding [independent contractors] from most employment laws because these individuals did not require the same legal protections as potentially more vulnerable, less-skilled 'employees.'"

50. Upon information and belief, DoorDash maintains uniform policies and terms of service with which all Dashers must comply. Failure to comply can result in immediate deactivation from the dasher App.

51. Upon information and belief, DoorDash assigns orders to its Dashers on a take-it-or-leave-it basis. Dashers are not given a list of available orders from which to choose.

52. DoorDash unilaterally determines how much to pay Dashers for each delivery. Dashers have no ability to set their own rates.

53. Before they accept an order, Dashers are not told how long they will have to wait at the vendor, even though DoorDash has already calculated a "food prep duration" for the order (based on historical data for the vendor).[5]

54. Upon information and belief, if a Dasher declines an order, they do not know if they will receive another. But they do know they will suffer consequences. If a Dasher tries to decline an order, the App asks, "Are you sure you want to decline this order?", and warns them about the consequences.

---

[5] Raghav Ramesh (Machine Learning Engineer at DoorDash), *How DoorDash Leverages AI in its on-demand Logistics Engine* (May 2018), at 18.

55. Dashers who decline orders face the loss of incentive pay and other delivery opportunities. Dashers who decline too many orders face termination.

56. During the course of a delivery, Dashers must follow all instructions in the Dasher App, including specific instructions for picking up the food, paying for it, and delivering it to the customer. They have no freedom to deviate.

57. DoorDash enforces a strict delivery schedule. Failure to deliver an order by the specified time will hurt Dashers' "metrics."

58. DoorDash scrutinizes drivers' "metrics" and takes away opportunities or terminates drivers whose "metrics" fall too low.

59. DoorDash uses these "metrics" as a means to exert its control over drivers.

60. DoorDash has the power to discipline drivers, including by denying them access to certain types of work. And DoorDash has the power to shut down drivers' access to the Dasher App for a myriad of reasons, thus preventing them from obtaining and responding to delivery requests.

61. Dashers' work is within DoorDash's "usual course of business."

62. DoorDash's usual course of business is food delivery. DoorDash markets itself as a food delivery service. DoorDash's home page is titled "DoorDash Food Delivery & Takeout," and its homepage description states "Delivery & takeout from the best local restaurants. Breakfast, lunch, dinner, and more, delivered safely to your door…" DoorDash wants people to think of it as a delivery service.

63. Dashers are central to DoorDash's business. Dashers provide the service that DoorDash sells to the public. DoorDash earns money by providing its customers with food delivery - a service that is wholly dependent on Dashers. DoorDash has created a fully integrated solution through which customers can order directly from the vendor and have their order delivered for a specified delivery fee. Customers cannot select their Dasher (for example, based on their ratings,

qualities, experience, or other factors). And Dashers cannot select their desired customers (for example, based on how much the customer is willing to pay or the distance to the customer's location).

**E. In the alternative, Dashers are at minimum DoorDash's agents.**

64. DoorDash will likely argue that its Dashers are not their employees; nonetheless, it is clear that the Dashers are at minimum agents of DoorDash who are subject to DoorDash's right of control.

65. Again, these Dashers are given credit cards by DoorDash to pay for the items that they are being paid to deliver. Furthermore, upon information and belief, Defendant Blater had a DoorDash sticker prominently displayed on his vehicle.

66. Plaintiff incorporates all the previous allegations regarding control above as if the same were stated in full herein.

**F. The DoorDash App and system incentivizes Dashers to use their phone while making deliveries to maximize profits.**

67. Nonetheless, DoorDash may try to convince the Court that it is a technological platform that merely connects vendors, Dashers, and customers. Even under this argument, DoorDash's negligence contributed to Mr. Balter crashing into Na. J.

68. In 2017, the Texas Legislature passed a statewide ban on using a wireless communications device while operating a motor vehicle. Despite this law and the widespread knowledge that using an electronic device while driving at the same time is incredibly dangerous—DoorDash allows and incentivizes its Dashers to use their electronic device when driving. The more deliveries that are made, the more money DoorDash makes.

69. Remember Raghav Ramesh stated DoorDash intentionally tracks every movement of its Dashers, plans their route, relays the route and every movement to its customer, and uses this data to create algorithms and AI to maximize efficiency.[6]

70. Nonetheless, DoorDash allows and incentivizes its Dashers to use the App at all times—even when they are driving and moving.

71. DoorDash could easily write code that would make it impossible for its Dashers to use the Dasher App. while they are driving, or at the very least, whenever the car is moving. Not allowing a Dasher from using the phone is both subjectively and objectively reasonable. Upon information and belief, many of DoorDash's similar competitors, such as Favor in Austin, do not allow their employees to use the App when driving. However, DoorDash disregards the public safety hazard of distracted driving, and instead is more concerned about maximizing efficiency of its Dashers –making as many deliveries as possible in the least amount of time.

G. **The VR Defendants failed to adequately warn drivers, failed to install reasonable traffic-control devices, and failed to adequately protect pedestrians through means that Defendant Venterra used at other properties it manages.**

72. This matter is amplified by the absence of safety measures taken by the VR Defendants. which own and manage Stonecreek Ranch Apartments prior to the collision. Defendant Venterra owns and manages over 30 complexes in Texas and more apartment complexes in 5 other states.[7] Defendant Venterra has the knowledge that these safety measures are necessary for its invitees and even deploys various safety measure at its other properties.

73. Stonecreek Ranch consists of numerous apartment buildings with a road-like driveway that spans hundreds of feet and weaves through property. Portions of the driveway are lined with parking spaces, while other portions are lined with landscaping. Due to the nature of the driveway and

---
[6] See generally, Id.
[7] www.venterraliving.com

11

parking lot at issue in this case, the VR Defendants knew or should have been aware of the reckless driving.

74. In fact, the VR Defendants recognized that automobile traffic in the parking lot is a safety concern, as illustrated by the 10 miles-per-hour speed limit signs posted throughout Stonecreek Ranch *before* the collision.

75. Plaintiffs expect discovery to reveal that reckless driving frequently occurred in the parking lot at Stonecreek Ranch and the VR Defendants had knowledge of the dangerous driving. Nonetheless, the VR Defendants failed to enforce its own safety rule despite knowledge of the dangerous driving. Notably, the VR Defendants installed speed bumps in parts of the parking lot *after* the collision.

76. In fact, the Plaintiffs expect discovery to reveal that the VR Defendants were not just subjectively aware of other collisions at Stonecreek Ranch, but that they took numerous other safety measures at other apartment complexes owned and managed by Defendant Venterra. Plaintiffs also expect discovery to reveal that Defendant Venterra took other safety measures, including but not limited to, speed bumps, stop signs at three-way intersections, and other warning signs at other apartment complexes that it manages and owns. But for unexplained reasons, the VR Defendants failed to take these same reasonable safety measures in similar circumstances at Stonecreek Ranch.

77. Plaintiffs expect discovery to show that speed bumps, stop signs, yield signs, warning signs, and other traffic-control signs not only require drivers to periodically stop and change speeds, but also assist in making drivers pay attention *the entire time they are driving* on the premises. Moreover, signs and traffic-control devices warn *both* drivers and pedestrians.

78. The VR Defendants knew or should have known that children would play in, or wander into, the driveway at issue. The driveway is akin to a residential street in a neighborhood. Plaintiffs expect discovery to show that children have been playing in residential streets for decades,

12

and that is very common for individual families and other business to protect against this danger by posting signs such as these ones below:



79. Indeed, the VR Defendants contributed by failing to take reasonable safety measures in parking lots—safety measure they employed at other properties—in order to help prevent and minimize automobile collisions on their premises. to the likelihood that such events would occur. By creating a parking lot and driveway without adequate traffic-control signage and enforcement, people familiar and unfamiliar with Stonecreek Ranch would drive recklessly.

80. The only safety measure the VR Defendants took at Stonecreek Ranch was posting the speed-limit signs intermittently on the property, which discovery will show were routinely violated by drivers and the VR Defendants did not enforce.

81. Upon information and belief, the consequence of the VR Defendants actions and inactions are that there have been numerous preventable collisions at Stonecreek Ranch and the other apartment complexes owned or operated by Defendant Venterra.

82. What makes Na. J.'s injury even worse is the fact that it occurred in front of her siblings Ni. J and K. J. Not an hour goes by where Ni. and K. J both relive the tragedy that behest their sister.

13

They both see their little sister wearing her helmet on a daily basis. They both witness their sister suffer from seizures.

## V. CAUSES OF ACTION

### A. Claims against Defendant Balter

1. Negligence and Bystander Action

83. Defendant Balter breached his duty to Plaintiffs by not exercising ordinary care with Plaintiffs in the following manners:

    a. Failing to maintain a proper lookout;

    b. Failing to control his speed;

    c. Failing to timely apply the brakes; and,

    d. Distracted driving.

84. Defendant Balter's breach of the duty he owed to Plaintiffs was the proximate cause of the injuries sustained by Plaintiffs. The injuries resulting from Defendant's conduct were foreseeable and Defendant's conduct was the cause-in-fact of Plaintiffs' injuries.

85. As a result of the incident described herein, Plaintiffs have incurred reasonable and necessary medical expenses, and in all reasonable probability, such medical expenses will continue in the future.

86. Plaintiff Na. J. experience physical pain and suffering in the past as a result of Defendant's negligence, and in all reasonable probability will sustain physical pain and suffering in the future as a result of Defendant's negligence.

87. Plaintiffs Ni. and K. J, who are both Na. J's siblings suffered mental anguish damages for emotional distress caused by Defendant's negligence.

88. Plaintiffs Ni. And K. J. were both present at the time of the crash and suffered shock as a result of direct emotional impact on them from a sensory and contemporaneous observance of Na. J being struck by the car driven by Defendant Balter.

89. Accordingly, Plaintiffs seek damages in an amount to be determined at trial.

**B. Claims against DoorDash**

1. Vicarious Liability – *respondeat superior, etc.*

90. The acts of Defendant Balter were performed while in the employment of Defendant DoorDash, to further Defendant's business, to accomplish the objective for which Balter was hired, within the course and scope of Balter's employment, and within the authority delegated to him.

91. Alternatively, at the time of the incident, Defendant Balter was acting within the scope of authority granted by Defendant DoorDash. Specifically, Balter was assigned the task of delivering goods on behalf of DoorDash. The task was assigned through DoorDash's Dasher App. There is no question Balter was acting under the authority of DoorDash.

92. Accordingly, DoorDash is liable under the theory of *respondeat superior* or comparable theories.

2. Negligence

93. Defendant DoorDash owed a legal duty to Plaintiffs, to act in a manner that would not create an unreasonable risk of harm. Defendant DoorDash breached the duty to Plaintiffs by establishing policies and procedures that not only enabled but encouraged its Dashers to use the Dasher App. while operating a motor vehicle. The application is not merely a map for directions, but also allows Dashers to accept and reject assignments while driving.

94. DoorDash creates a dangerous condition by having its Dashers on the road and using an electronic device while driving. This is despite the fact that DoorDash tracks each Dashers every movement.

95. This is also despite the fact that many of its competitors do not allow their respective drivers to use their applications while driving.

96. DoorDash also breaches this duty to Plaintiffs by providing financial incentives to its Dashers to rush deliveries and speed to the next one. This incentive results in dangerous and inattentive Dashers in high-frequency residential areas.

97. It is reasonably foreseeable that Dashers would use the Dasher App. while driving, which would inevitably lead to motor vehicle crashes, such as the one that is the basis of this lawsuit. DoorDash is negligent in its control of the Dasher App. DoorDash has direct knowledge that Dashers use the Dasher App. when driving. Despite DoorDash's knowledge and ability to limit Dasher's ability to use the Dasher App. when driving—DoorDash allows and incentivizes Dashers to use the Dasher App. even when they are in the middle of driving. DoorDash's breach proximately caused injuries to Plaintiffs, which resulted in damages, including past and future pain and suffering, past and future medical expenses, and mental anguish.

3. <u>Gross Negligence</u>

98. Plaintiffs seek and are entitled to exemplary damages from DoorDash because DoorDash's actions were willful. DoorDash encourages its Dashers, like Defendant Balter, to use the Dasher App. as much as possible to increase efficiency and maximize profits.

99. DoorDash authorized and incentivized Balter to drive and use the Dasher App. while he was driving and making a delivery. DoorDash knows the risks of distracted driving and using an electronic mobile device while driving. Despite this, DoorDash put profits over the public health.

100. DoorDash has a plethora of data—tracking every movement for its AI and to relay the Dashers' location to customers. DoorDash is well aware of when Dashers are moving and when Dashers are using their electronic devices. Nonetheless, DoorDash ignores this danger (even though many of its competitors do not).

101. DoorDash's conduct rises to the level of gross negligence as the term is defined under Chapter 41 of the Texas Civil Practice and Remedies Code. Plaintiffs also demand exemplary damages.

4. Bystander Action

102. Ni. and K. J. also bring their bystander claims against DoorDash.

**C. Claims against VR Defendants**

1. Premises Liability

103. Plaintiffs Na, K., and Ni. J are all invitees of the VR Defendants.

104. Upon information and belief, The VR Defendants are aware that there are tenants and non-tenants who are not familiar with the Stonecreek Ranch Apartment parking lot. The VR Defendants breached their duty to Plaintiffs by failing to maintain speed-control devices, such as speed bumps, having traffic-control signs, such as stop or yield signs at intersections, and warning signs regarding children.

2. Negligent Undertaking

105. In the alternative that the Court finds there is no viable premises liability claim, Plaintiffs plead that there was a negligent undertaking claim. The VR Defendants created a parking lot and posted 10 miles per hour speed limit signs, thus undertaking the duty to regulate traffic in the parking lot at Stonecreek Ranch Apartments. Despite posting these speed limit signs in some places, the VR Defendants failed to enforce this rule, put in speedbumps, and install traffic-control signs (including but not limited to, stop and yield signs at intersections). Thereby, the VR Defendants failed to exercise care. Plaintiffs relied on the VR Defendants enforcing their own rules, and by not enforcing these rules the VR Defendants increased the risk of Plaintiffs' harm.

## VI. Request for Relief

106. WHEREFORE, Plaintiffs, Na., K., and Ni J request a jury trial and that this Court grant the following relief against Brenden Balter, DoorDash, VR Stonecreek Holdings, L.P., and Venterra Realty Management Company Inc.:

(a) Actual damages in an amount to be determined at trial;

(b) Exemplary damages;

(c) Pre-judgment interest as provided by law;

(d) Post-judgment interest as provided by law;

(e) Reasonable and necessary attorneys' fees;

(f) Court costs; and,

(g) Such other and further relief to which Plaintiffs may justly be entitled.

Respectfully Submitted,

/s/ Daniel R. Smith
Daniel R. Smith
State Bar No. 24095902
Joel A. Levine
State Bar No. 24065612
LAW OFFICE OF JOEL A. LEVINE, PLLC
1515 W. Koenig Lane, Suite 100
Austin, TX 78756
512.982.1510 Telephone
512.367.5928 Fax
daniel@joelalevine.com
joel@joelalevine.com
Attorneys for Plaintiffs

**CERTIFICATE OF SERVICE**

The foregoing document will be served on all counsel of record via the Court's ECF/ENS system on the date of entry on the Court's docket.

/s/ Daniel R. Smith